**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────

TOWAUN COLEMAN,

                Plaintiff,

      v.

                                          No. 9:18-CV-0390
ANDREW CUOMO, et al.,                         (MAD/CFH)

                Defendants.

─────────────────────────────

**APPEARANCES:**                    **OF COUNSEL:**

Towaun Coleman
07-A-2215
Clinton Correctional Facility
P.O. Box 2001
Dannemora, New York 12929
Plaintiff pro se

Attorney General for the           ERIK BOULE PINSONNAULT, ESQ.
  State of New York             Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

      Plaintiff pro se Towaun Coleman ("Plaintiff"), an inmate who was, at all relevant

times, in the custody of the New York State Department of Corrections and Community

Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that

───────────────

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

defendants[2] former Superintendent of Clinton Correctional Facility ("Clinton") Steven

Racette ("Supt. Racette"); Correctional Lieutenant Durkin[3] ("Lt. Durkin"); Correctional

Sergeant (Sgt.) Hutti; Sgt. King; Sgt. Wood[4]; Correctional Officer ("C.O.") Reyell; C.O.

Wyatt, C.O. Dubrey, C.O. Spinner, C.O. Tyler, and John Does #1-4[5]—who, at all

relevant times, were employed at Clinton—violated his constitutional rights under the

First and Eighth Amendments.  See Dkt. No. 31 ("Amen. Compl.").[6]

Presently pending before the Court is defendants' partial motion to dismiss the

Amended Complaint pursuant to Rules 12(b)(6) and 12(c) of the Federal Rules of Civil

---

[2]  The action was terminated as to defendants Andrew Cuomo, Governor of the State of New York; Anthony Annucci, Acting Commissioner of DOCCS; and DOCCS pursuant to the Court's previous memorandum orders on initial review.  See Dkt. Nos. 5, 33.  The Clerk of the Court is respectfully directed to modify the caption accordingly.

[3]  The New York State Attorney General's ("AG") Office has identified this individual's correct name as "Durkin," not "Derkin."  See Dkt. No. 44-1 at 3 n.4.  The Clerk of the Court is respectfully directed to modify the docket to reflect this change.

[4]  The AG's Office has identified this individual's correct name as "Wood," not "Woods."  See id. at 4 n.6. The Clerk of the Court is respectfully directed to modify the docket to reflect this change.

[5]  Plaintiff has not yet identified the Doe defendants.  Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days after the filing of the complaint.  FED. R. CIV. P. 4(m).  This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within 60 days of the filing of the complaint.  N.D.N.Y. L.R. 4.1(b).  Plaintiff filed his Amended Complaint on December 19, 2018.  Dkt. No. 31 ("Amen. Compl.").  Therefore, both the 60-day and the 120-day deadlines have expired.  On February 20, 2019, the Court advised plaintiff that he may submit written interrogatories to defendants without leave of this Court wherein he may request, among other things, further information regarding the correct names of the "Doe" defendants.  Dkt. No. 39.  Accordingly, plaintiff is reminded that he must take reasonable steps through discovery to name and serve the John Doe Defendants, or his claims against them will be dismissed for failure to prosecute and/or failure to comply with an Order of the Court, pursuant to Fed. R. Civ. P. 41(b).

[6]  Following initial review of plaintiff's Amended Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), District Judge Mae D'Agostino held that the following claims survived sua sponte review: plaintiff's (1) First Amendment retaliation claims against Lt. Durkin, John Doe # 1, and Sgt. Woods; (2) Eighth Amendment claims for excessive force and failure to intervene against John Doe #1-4, Lt. Durkin, Sgt. Hutti, Sgt. King, C.O. Reyell, C.O. Wyatt, C.O. Tyler, C.O. Dubrey, C.O. Spinner (failure to intervene only), and Supt. Racette (based on supervisory liability); and (3) state law negligence claims against John Does # 1-4, Lt. Durkin, Sgt. Hutti, Sgt. King, C.O. Reyell, C.O. Wyatt, C.O. Dubrey, C.O. Tyler, C.O. Spinner, and Supt. Racette (based on the doctrine of respondeat superior).  See Dkt. No. 33 at 16.  The Court dismissed the remainder of plaintiff's claims with prejudice.  See id. at 3-14, 16-17.

Procedure ("Fed. R. Civ. P.").  See Dkt. No. 44.  Plaintiff opposed defendants' motion, see Dkt. No. 48, and defendants filed a reply.  See Dkt. No. 49.  For the reasons that follow, it is recommended that defendants' motion be granted in part and denied in part.

## I. Background

### A. Facts

The facts are reviewed in the light most favorable to plaintiff as the non-moving party.  See subsection II.A., infra.  At all relevant times, plaintiff was an inmate incarcerated at Clinton.

### 1. June 8, 2015 Cell Search

The incidents alleged in the Amended Complaint occurred in the wake of the highly-publicized escape of Richard Matt and David Sweat from Clinton on June 6, 2015.  See Amen. Compl. at 10 ¶ 23.  On June 8, 2015, "Clinton [c]orrectional [o]fficers began a facility[-]wide cell frisk."  Id. at 12 ¶ 30 (internal quotation marks omitted).  Between 8:00 A.M. and 9:00 A.M., a "search team" consisting of Clinton correction officers entered plaintiff's housing unit, the Upper H. Block in 12 Company, "and began filing in a line" with two officers standing in front of each cell.  Id. at 12 ¶ 31.  The "search team" consisted of C.O. Reyell, C.O. Dubrey, C.O. Tyler, and John Does #1-3.  See id. at 6-7 ¶¶ 14-15, 7-9 ¶¶ 17-20.  Plaintiff was ordered to step outside of his cell, turn around, and place his hands on the cell bars facing inside the cell.  See id. at ¶ 33.  Two unidentified C.O.s commenced a "search of [plaintiff's] cell" at which time plaintiff "witnessed" one of the unidentified officers "reading through" his phonebook while the

other unidentified officer "read through [his] civil complaint [and they] whispered amongst themselves as they continued to read." Dkt. No. 31-1 at 44-48; see Amen. Compl. at 12 ¶ 34.[7]  "After [the two unidentified officers] finished reading, they began to throw away some of [plaintiff's] personal property." Dkt. No. 31-1 at 45.

Plaintiff "began to address Sgt. Hutti about the issue of [his] personal property being thrown away" when Lt. Durkin asked the two C.O.s searching plaintiff's cell "what[']s taking you so long." Amen. Compl. at 13 ¶ 35.  In response, one of the unidentified C.O.s stated, "he has too much shit." Id.  Lt. Durkin then "yell[ed] in [plaintiff's face]," "you need to throw all this shit away before I do!" Id. at ¶ 36.  Plaintiff replied that all he had was "four . . . property bags of stuff which [he was] permitted to have" and that "most of it [was his] legal work for [his then-pending civil rights] case."[8] Id.  Lt. Durkin "yell[ed]," "I don't care how much fucking property is permitted—throw this shit away before I do." Id. at ¶ 37.

Plaintiff then "hear[d] one of the [unidentified] C.O.s inside his cell state" that plaintiff had "been running his mouth all day," at which point John Doe # 1 approached

---

[7]  The paragraph from which the beginning of this quoted language is taken ends abruptly mid-sentence at the end of ECF page 12.  See Amen. Compl. at 12 ¶ 34.  However, it appears that plaintiff mistakenly omitted the remainder of this paragraph when transcribing by hand the fact section in his Amended Complaint from his typed-original complaint, as evidenced by the fact that plaintiff used white-out to correct a mistake in the numbering of the paragraphs in his Amended Complaint.  See id.  The facts, as stated in the original complaint containing the quoted language concerning the unidentified C.O.s reading plaintiff's prior civil complaint, are also contained in the inmate grievance that plaintiff attached to the Amended Complaint as an exhibit and plaintiff clearly wishes to use these allegations in support of his First Amendment retaliation claim against Lt. Durkin.  Therefore, the undersigned reads the Amended Complaint as containing these factual assertions.  See Dkt. No. 1 at 12 ¶ 34; Dkt. No. 31-1 at 44-48; see also DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) ("[I]n considering a motion to dismiss . . . a district court consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.") (internal quotation marks and citations omitted); Camarano v. City of New York, 624 F. Supp. 1114, 1147-48 (S.D.N.Y. 1986) ("[A] pro se civil rights complaint[] should be . . . given the benefit of incorporation.") (internal quotation marks and citation omitted).

[8]  The prior civil rights case plaintiff references throughout the Amended Complaint is Coleman v. Nolan, 9:15-CV-40 (ATB).

plaintiff and "struck [him] in the face with [his] fist while in the presence of Sgt. Hutti and Lt. Durkin[]." Id. at 13 ¶ 38, 14 ¶ 39. Plaintiff was then "grabbed by a number of C.O.s that were part of the search team [and] lifted off of his feet while someone forcefully bent both of [his] arms behind his back and[] roughly cuffed [him.]" Id. at 14 ¶ 39. Plaintiff was "carried . . . to the front of 12 Company . . . where [he] was savagely beaten by an unknown amount of C.O.s" "for what appeared to be a half . . . hour" until plaintiff heard someone yell, "that's enough!" Id. at ¶¶ 39, 40. Plaintiff then heard Sgt. King repeat that statement. See id. at 15 ¶ 41. Plaintiff states that C.O. Spinner was "stationed in the hallway area where plaintiff was assaulted." Id. at 7 ¶ 16.

Plaintiff was then placed on his feet and Sgt. King stated that "[he] could put [plaintiff] back inside of [his] cell or . . . take[ him] to the Unit where [he would] write plaintiff a ticket resulting in [five] years in the box." Dkt. No. 31-1 at 46. Plaintiff stated that he wished to go back to his cell because he "felt the need to lay down and go to sleep." Amen. Compl. at 15 ¶ 41. John Doe # 4 then "returned [plaintiff] to his cell without further incident" and uncuffed him. Id. at ¶ 42.

Plaintiff was "afraid to forcefully report his injuries without first learning the names of the individuals [who] assaulted him or were present" because he had been "assaulted [and] harassed" by Clinton C.O.s previously, which was the basis for his prior lawsuit, and "was deliberately being denied medical attention via sick[]call process." Id. at 16 ¶ 44.[9] He also "feared going to the box for five . . . years as Sgt. King threatened." Id. at

---

[9] Plaintiff asserts that, following the alleged June 8, 2015 assault, he "attempted to seek medical attention by placing a sick call slip on his gate . . . . [e]very night" for four days." Amen. Compl. at 15-16 ¶ 43. He states that C.O.s collected his sick call slips each night, but that he was "never let out for his requested sick call." Id. at 16 ¶ 43. In reviewing these same allegations on initial review of plaintiff's original complaint, the Court observed that plaintiff

¶ 45. However, plaintiff states, once he "learned the names of the officers that participated in the assault or [were] present" he "reported the incident formally . . . one week after the facility was let off of lockdown." Id. at ¶ 46.  Plaintiff states that, as a result of the alleged assault on June 8, 2015, he "has experienced . . . acute pain in his lower back and suffers from recurring painful migrain[e]s." Id. at 17 ¶ 47.

### 2. June 25, 2015 Inmate Injury Report and Grievance

On June 25, 2015,[10] plaintiff sought medical attention for the injuries he allegedly sustained as a result of the events on June 8, 2015.  See Amen. Compl. at 17 ¶ 48. When plaintiff arrived at the medical clinic, a nurse summoned Sgt. Wood.  See id.  Sgt. Wood and an unidentified officer placed plaintiff in a small room questioned him about the June 8, 2015 incident.  See id.  Plaintiff informed Sgt. Wood "that O.S.I. and another agency came to the facility to speak with [him] about such matters." Id.  Plaintiff was then escorted to the nurse, who examined plaintiff but did not ask him any questions. See id.

---

has not asserted an Eighth Amendment claim for deliberate indifference to his serious medical needs.  Moreover, plaintiff, who [was then] incarcerated at Green Haven Correctional Facility, has not sued any state actors from that facility.  Nor has he identified any individuals personally involved in denying him adequate medical care, or access to it.  As a result, the Court does not construe the complaint to have asserted an Eighth Amendment claim for medical indifference.

Dkt. No. 5 at 7 n.2.  Plaintiff did not assert new allegations in this regard in his Amended Complaint and the Court, on initial review of the Amended Complaint, did not conclude that plaintiff raised claims related to the denial of medical care.  See generally Dkt. No. 33.  Therefore, the undersigned declines to construe the Amended Complaint as asserting an Eighth Amendment medical indifference claim.

[10] Plaintiff states that he was seen by the nurse and Sgt. Wood on "8-25-15." Amen. Compl. at 17 ¶ 48. However, plaintiff signed the Inmate Injury Report on June 25, 2015.  See Dkt. No. 31-1 at 42.  Therefore, it appears that plaintiff made a mere scrivener's error concerning the date of his medical evaluation in the Amended Complaint.

After plaintiff was examined by the nurse, Sgt. Wood brought him an Inmate Injury Report, DOCCS form 1595, and told plaintiff to write "what happened [on June 8, 2015] briefly and sign it." Id. at 18 ¶ 48. Plaintiff wrote, "I was assaulted by C.O.[]s on [June 8, 2015]." Id. Sgt. Wood read the form, threw it away, and stated, "you fucking smart ass." Id. Sgt. Wood then filled out a new Inmate Injury Report, in which he wrote, "I was assaulted," "forging [plaintiff's] statement." Id. Sgt. Wood then gave plaintiff a menacing look and told him to sign the second form, which plaintiff did. See id.; see also Dkt. No. 31-1 at 42. The Inmate Injury Report states, in relevant part, under the section titled "Description of Injury," "reviewed in shorts, no injury noted." Dkt. No. 31-1 at 42.

On the same day he was interviewed by Sgt. Wood, June 25, 2015, plaintiff submitted an inmate grievance in which he set forth the facts concerning the June 8, 2015 incident as discussed in subsection I.A.1, supra. See Dkt. No. 31-1 at 44. Plaintiff's grievance listed Lt. Durkin, Sgt. Hutti, Sgt. King, C.O. Reyell, C.O. Wyatt, C.O. Dubey, C.O. Spinner, and C.O. Tyler, as "either . . . individuals that assaulted [plaintiff] or . . . witnessed the assault" and stated that he had "yet to identify the [C.O.] who initially punched him." Id. at 47. On July 17, 2015, plaintiff received notice from nonparty Superintendent Michael Kirkpatrick ("Kirkpatrick"), Supt. Racette's successor, that his grievance had been received and was being forwarded to the Inmate Grievance Program ("IGP") for processing. See Dkt. No. 31-1 at 48. On July 23, 2015, Kirkpatrick denied the grievance as being "without merit." Dkt. No. 31-1 at 52. Kirkpatrick observed that an investigation was conducted, which included an interview with plaintiff

7

and the staff members named in the complaint and noted that plaintiff had "not provided a single witness or any evidence to support [his] allegations." Id.

On August 12, 2015, plaintiff appealed Kirkpatrick's denial to the IGP's Central Office Review Committee ("CORC"). See Dkt. No. 31-1 at 60-62.[11] Plaintiff's Appeal Statement briefly restated the facts regarding the alleged assault and added that, on July 17, 2015, plaintiff was "pulled out of work and escorted by C.O. Fuller to the . . . admin[istrative building] where [he] was interviewed by a captain." Id. at 60. Plaintiff stated that the captain asked him whether he had been interviewed by a sergeant after he was examined by medical staff, and plaintiff replied that "Sgt. Wood interviewed [him]." Id. at 61. Plaintiff also asserted, for the first time, that the captain who investigated his grievance "did not ask [him] if [he] had any witnesses or any evidence on [his] behalf." Id. He also stated that he did "not submit[] any evidence with [his] appeal because [he] believed this whole process/grievance system [was] bias" and that he was "simply filing []his appeal for the sake of formality." Id. at 62. On October 7, 2015, following an administrative hearing, CORC upheld the denial of plaintiff's grievance. See Dkt. No. 31-1 at 64. CORC noted that plaintiff raised separate issues in his appeal statement that were not addressed in his original grievance, and "assert[ed] that all relevant information must be presented at the time of filing in order for a proper investigation to be conducted at the facility level." Id.

## B. Plaintiff's Amended Complaint

---

[11] Plaintiff originally attempted to file an Appeal Statement on July 24, 2015. See Dkt. No. 31-1 at 54-56. However, on August 12, 2015, nonparty IGP Supervisor C. Gregory informed plaintiff through a memorandum that CORC had not received an appeal for his grievance. See id. at 58.

The Amended Complaint asserts three causes of action following the Court's initial review.[12]  First, plaintiff claims that Lt. Durkin, Sgt. Wood, and John Doe #1[13] retaliated against him in violation of his First Amendment rights.  See Amen. Compl. at 19-20 ¶¶ 53-59; 13-14 ¶¶ 35-40; 17-18 ¶ 48.  Liberally construed, the Amended Complaint alleges that Lt. Durkin violated plaintiff's First Amendment rights by failing to prevent members of the search team from assaulting him in retaliation for his verbal statement, in protest to Lt. Durkin's orders to throw away his property, that he "ha[d] . . . four . . . property bags of stuff which [he was] permitted to have" and that "most of it [wa]s [his] legal work for [his then-pending civil rights] case." Id. at 13 ¶ 36.  Further, plaintiff alleges that Sgt. Wood violated his First Amendment rights by (1) disposing of plaintiff's original Inmate Injury Report in which plaintiff wrote that he "was assaulted by C.O.[]s on [June 8, 2015]"; (2) replacing it with an Inmate Injury Report that Sgt. Wood drafted, which stated only "I was assaulted"; and (3) coercing plaintiff to sign the new report by giving him a "menacing[]" look and telling him to sign it.  Id. at 18 ¶ 48; see Dkt. No. 31-1 at 42.

Second, liberally construing the Amended Complaint, plaintiff asserts Eighth Amendment claims of excessive force and failure to intervene against John Does #1-4, C.O. Reyell, C.O. Wyatt, C.O. Dubrey, C.O. Tyler, C.O. Spinner, Lt. Durkin, Sgt. Hutti, and Sgt. King, alleging that those defendants either participated directly in the June 8, 2015 assault or failed to intervene.  See Amen. Compl. at 12-15 ¶¶ 31-42; 19-21 ¶¶ 54-59.  Plaintiff further asserts a claim for supervisory liability against Supt. Racette based

---

[12]  See supra at 2 n.6; see also Dkt. No. 33.

[13]  Because John Doe #1 is not a party to defendants' present motion, this Report-Recommendation & Order will not discuss plaintiff's First Amendment retaliation claim against that defendant.

on his Eighth Amendment claims.  See id. at 11 ¶ 28.  In particular, plaintiff contends

that Supt. Racette "approved and encouraged" Governor Cuomo's policy "to do

whatever was necessary to obtain information about the escape," which resulted in

facility-wide violations of inmates' constitutional rights.  Id. at 11 ¶¶ 27.

Third, plaintiff asserts a New York State law negligence cause of action against

C.O. Reyell, C.O. Wyatt, C.O. Dubrey, C.O. Tyler, and C.O. Spinner based on their

alleged failure to "protect [plaintiff] from the intentional misconduct of" members of the

search team who allegedly assaulted him during the June 8, 2015 cell search.  See id.

at 23-24 ¶¶ 67-69.  He further asserts this claim under the doctrine of respondeat

superior against Supt. Racette, Lt. Durkin, Sgt. Hutti, and Sgt. King.  See id. at 25 ¶¶

74-76.

### C. Plaintiff's Exhibits

Plaintiff attached 68 pages of exhibits to his Amended Complaint.  See generally

Dkt. No. 31-1.  As relevant here, plaintiff's exhibits include the Inmate Liaison

Committee ("ILC") meeting minutes from August 21, 2015, which state that "The ILC

said population is expressing issues with physical and verbal abuse by officers without

impunity to the extent of abuse of authority."  Dkt. No. 31-1 at 21.  In response,

"Superintendent [Kirkpatrick] requested examples[, n]oted that State IG and OSI [we]re

investigating[, and that l]etters [we]re being received from the inmate population

regarding complaints and [we]re being addressed accordingly."  Id.  Further, plaintiff

attached as exhibits to the Amended Complaint several letters from the Correction

Association of New York ("the CA"), "a non-profit advocacy organization with legislative

authority to inspect state prisons." Dkt. No. 31-1 at 17.  One such letter indicated that "[t]he CA [wa]s particularly concerned about the treatment of people incarcerated at Clinton in recent months following the escape from the facility, as well as more general issues." Id.  That letter also stated that "[t]he CA issued a report about Clinton [in the] fall [of] 2014 based on a 2012 visit and 2014 follow-up data and information.  The report documented serious issues of staff abuse [and] harassment    . . . ." Id.  Plaintiff also attached an August 26, 2015 letter from the CA acknowledging that plaintiff met with representatives from the CA, that the CA "met with thirty people at Clinton during this visit," and that the CA

> "[wa]s very concerned about many issues and challenges [it]
> learned about during these interviews.  As you know from
> our past correspondence and our recent meetings, the CA
> has been engaging in investigations and advocacy about
> staff brutality, solitary confinement, medical and mental
> health care, and other issues related to N[ew] Y[ork]
> prisons."

Dkt. No. 31-1 at 18.

Moreover, four inmates housed on plaintiff's cellblock at Clinton submitted affidavits on plaintiff's behalf.  See Dkt. No. 31-1 at 4-15.  As relevant here, Donovan Mais ("Mais"), an inmate at Clinton, stated that, on June 8, 2015, C.O.s at Clinton "trash[ed his] cell" and "when [he] protested [a C.O.] throwing away [his] brand new fan[,] officers rushed [him] and escorted [him] off the company in an effort at intimidation."  Dkt. No. 31-1 at 12 ¶ 3.  Mais further stated that one officer "turned to [him] and said you see you could have easily ended up like your buddy down there referring to [plaintiff]."  Id.  He also stated that, after hearing plaintiff being assaulted, an officer told him, "if you say anything[,] you're next."  Id.

11

**D. Defendants' Motion**

Defendants' motion seeks partial dismissal of the Amended Complaint.  See Dkt. No. 44 at 1.  Supt. Racette, Lt. Durkin, Sgt. King, Sgt. Hutti, C.O. Wyatt, C.O. Tyler, and C.O. Dubrey move pursuant to Fed. R. Civ. P. 12(c) to dismiss the Amended Complaint, in part, insofar as it asserts (1) a First Amendment retaliation claim against Lt. Durkin, on the ground that plaintiff's claim fails as a matter of law; (b) New York State law negligence claims against those defendants, as barred by New York State Correction Law § 24; and (c) a supervisory liability claim against Supt. Racette premised on plaintiff's Eighth Amendment claims on the basis that plaintiff failed to establish Supt. Racette's personal involvement.  See id.; see also Dkt. No. 44-1 at 7-10, 13-17.  Sgt. Wood, C.O. Spinner, and C.O. Reyell[14] move pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Amended Complaint, in part, insofar as it asserts (1) a First Amendment claim against Sgt. Wood for (a) failure to state a claim, or, in the alternative, (b) failure to exhaust administrative remedies; and (2) a New York State law negligence claim against C.O. Spinner and C.O. Reyell, as barred by New York Correction Law § 24. See id.; see also Dkt. No. 44-1 at 10-15.  Defendants' motion does not seek dismissal of plaintiff's Eighth Amendment claims of excessive force and failure to protect asserted against John Does #1-4, C.O. Reyell, C.O. Wyatt, C.O. Dubrey, C.O. Tyler, C.O. Spinner, Lt. Durkin, Sgt. Hutti, and Sgt. King.  See id.

---

[14]  See Dkt. No. 58 ("Mr. Reyell respectfully requests permission to join in the motion to dismiss pursuant to [Fed. R. Civ. P.] 12[b][6] that is currently pending before the Court.  In particular, Mr. Reyell requests dismissal of the state law claims asserted against him for the reasons set forth in . . . defendants' Memorandum of Law in Support of the Motion to Dismiss."); Dkt. No. 59 (granting Reyell's request).

### E. Briefing on Defendants' Motion

### 1. Defendants' Memorandum of Law

In their memorandum of law, defendants assert five arguments.  See generally Dkt. No. 44-1.  First, defendants argue that plaintiff's First Amendment claim against Lt. Durkin fails as a matter of law because plaintiff did not engage in constitutionally-protected activity when he verbally informed Lt. Durkin that he had a permissible amount of property in his cell which included his legal work.  See id. at 9.  In particular, defendants aver that plaintiff's interaction with Lt. Durkin was the "type of isolated verbal confrontation [that] does not constitute constitutionally protected activity."  Id.

Second, defendants contend that plaintiff's First Amendment claim against Sgt. Wood fails as a matter of law because, even if plaintiff's reporting of the alleged assault to Sgt. Woods was constitutionally-protected conduct or speech, he cannot establish adverse action.  See id. at 10.  Defendants further aver that, "even if Sgt. Wood's alleged actions could be construed as an adverse action . . . his alleged actions are . . . de minimis, and therefore outside the ambit of constitutional protection."  Id.  Third, defendants argue, in the alternative, that plaintiff's First Amendment claim against Sgt. Wood must be dismissed for failure to exhaust administrative remedies because plaintiff did not file a grievance against him based on the alleged June 25, 2015 incident.  See id. at 11-13.  Fourth, defendants argue that plaintiff's state law negligence claims must be dismissed as barred by New York Correction Law § 24 because the alleged incidents on June 8, 2015, occurred while defendants were at work performing their job duties.  See id. at 14.

13

Fifth, defendants argue that plaintiff's supervisory liability claim against Supt. Racette should be dismissed for plaintiff's failure to sufficiently allege Supt. Racette's personal involvement. See id. at 15.  In particular, defendants contend that Supt. Racette's position of authority at Clinton during the relevant time period, without more, is insufficient as a matter of law to establish his personal involvement in "the discrete and isolated constitutional violations alleged." Id. at 16.  Defendants further argue that the Amended Complaint fails to allege facts from which the Court could plausibly infer that the alleged constitutional violations against plaintiff were the result of any policy or directive endorsed by Supt. Racette in order to obtain information about the escape and alleges only that plaintiff was assaulted by DOCCS employees following an argument regarding the propriety of the amount of property he possessed in his cell, of which Supt. Racette had no knowledge. See id.  In addition, defendants contend that "[t]he fact that plaintiff was confined in [Upper H block], "rather than A block (aka the Honor Block), distinguishes him from other inmate-plaintiffs who filed lawsuits alleging constitutional violations following the escape." Id. at 3 n.1 (citing Martinaj v. Uhler, No. 9:18-CV-00257 (BKS/DJS), 2019 WL 652251, at *1-2 (N.D.N.Y. Feb. 15, 2019)).


### 2. Plaintiff's Opposition

In opposition to defendants' motion, plaintiff asserts three arguments. See generally Dkt. No. 48.  Addressing plaintiff's arguments in the order raised in defendants' motion to dismiss, he contends that he sufficiently stated a claim for First Amendment retaliation against Lt. Durkin. See id. at 11-13.  Although he acknowledges that verbally informing Lt. Durkin that "most of [his property] was his legal work" "may

14

not in itself totally be protected," plaintiff asks the Court to "draw the inference" that "in protesting against throwing his property away in which most of it was his legal work, [plaintiff] was in fact actively litigating." Id. at 12.  He further contends that, because he stated in the Amended Complaint that "most of the time spent searching his cell was actually spent reading his [prior] 1983 complaint . . . . not only did [he] articulate . . . that he was engaged in a protected activity, [he] never stopped litigating his criminal conviction." Id.[15]  Moreover, plaintiff asserts that "it is clear that Lt. [Durkin] did not assault [him]," but "the fact that [he] protested against throwing away his legal work could have been the motivating factor as to why Lt. Durkin did not intervene [and] stop[] the assault against [him]." Id. at 13.

Next, plaintiff argues that that his "state law claims should not be dismissed because they were sufficiently pled." Id.  However, plaintiff does not address his state law negligence claim; rather, he focuses his argument in this regard exclusively to his state law intentional infliction of emotional distress (IIED) claim, see id. at 10, which was previously dismissed pursuant to the Court's prior orders on initial review.  See Dkt. No. 5 at 23; Dkt. No. 33 at 10-11.[16]

---

[15]  The Amended Complaint does not contain such allegations, as the page corresponding to plaintiff's original complaint in which he asserted these facts abruptly ends mid-sentence.  However, because these facts were asserted in plaintiff's grievance, which plaintiff attached to the Amended Complaint, and in his opposition to defendants' motion, the Court may consider this argument.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); see also Walker v. Schult, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion." (citing Gill v. Mooney, 824 F.2d 192, 195 (2d Cir. 1987)).

[16]  Upon initial review of the original complaint, the Court dismissed plaintiff's New York State law claim for intentional infliction of emotional distress on the bases that (1) Section 1983 does not recognize such claims and (2) the claim was time-barred.  See Dkt. No. 5 at 23.  Upon initial review of the Amended Complaint, the Court dismissed this claim with prejudice for the reasons set forth in its May 2018 order on initial review of the original complaint.  See Dkt. No. 33 at 10, 16.

Finally, plaintiff argues that the Amended Complaint establishes Supt. Racette's personal involvement.  See Dkt. No. 48 at 10-11.  Plaintiff argues that Supt. Racette "knew during the escape and the immediate lock[]down . . . that unlawful activities were occurring, but did not stop them."  Id. at 10.  Plaintiff asserts that Supt. Racette was "aware of" "a long standing history of assault[ by DOCCS staff against] inmates" at Clinton before the escape occurred, but "failed to manage his subordinates so that these unlawful activities would not occur."  Id. at 11.  He posits that Supt. Racette "failed to act on information indicating that unconstitutional acts were occurring" at Clinton, because "for years leading up to the escape[,] the inmate population ha[d] complained over and over again about . . . beatings and assaults . . . endured at the hands of Clinton corr[ection] officers."  Id.  Plaintiff references his previous civil rights law suit and the attached ILC minutes in support of this contention.  See id.  "Furthermore," plaintiff avers, Sgt. Racette's conduct during the post-escape investigation "constitute[d] gross negligence . . . because[] he knowingly allowed plaintiff to be unlawfully assaulted as part of an investigation he oversaw[] by failing to properly manage his subordinates."  Id. (internal quotation marks omitted).  Plaintiff contends that Supt. Racette ordered correctional staff at Clinton to "do whatever was necessary to obtain information about the escape," which led to DOCCS personnel "assaulting and outright beating individuals of the inmate population."  Id.

### 3. Defendants' Reply

With respect to plaintiff's First Amendment retaliation claim against Lt. Durkin, defendants argue that plaintiff's filing of his prior section 1983 lawsuit "is not the speech

or activity at issue here." Dkt. No. 49 at 2.  Defendants further contend that that plaintiff's act of verbally protesting defendants throwing away his legal work should not be considered protected activity because "merely . . . possess[ing] legal work" is insufficient to support a retaliation claim and does not establish that plaintiff was "actively litigating." Id. at 2.  Further, defendants posit that plaintiff cannot establish a causal connection between his alleged protected activity and the adverse action of assault because plaintiff's legal materials "were both unrelated to this case and unrelated to Lt. Durkin." Id.  Next, defendants point out that plaintiff did not oppose their motion insofar as it requests dismissal of his First Amendment retaliation claim against Sgt. Wood and, therefore, that claim should be dismissed as abandoned. See id. at 1. In addition, defendants observe that plaintiff did not "directly refute [their] arguments" concerning plaintiff's state law negligence claims and reassert that those claims must be dismissed as barred by New York Correction Law section 24. Id. at 2.

Moreover, defendants reassert that plaintiff has failed to sufficiently allege that Supt. Racette was personally involved in the alleged constitutional violations and argue that plaintiff's contentions concerning the purported history of abuse at Clinton "are entirely speculative, overly broad, and conclusory." Id.  Defendants also argue that the Amended Complaint fails to establish Supt. Racette's personal involvement based on his purported endorsement of Cuomo's order to use "whatever means necessary to obtain information about the escape" because plaintiff alleges that he was assaulted as a result of a disagreement about the amount of property he possessed in his cell, not to obtain information about the escape. Id.

17

## II. Discussion[17]

### A. Legal Standard

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." Cleveland v. Caplaw Enterprises, 448 F.3d 518, 521 (2d Cir. 2006) (citing Karedes v. Ackerley Grp., Inc., 423 F.3d 107, 113 (2d Cir. 2005)).  When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor."  Selevan v. New York Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009)) (internal quotation marks omitted).  However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "'plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible . . . .") (internal quotation marks and citation omitted).  Determining whether plausibility exists is "a context-

---

[17]  All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest.  At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

Furthermore, "[a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion." Walker v. Schult, 717 F.3d 119, 122 n.1 (2d Cir. 2013) (citing Gill v. Mooney, 824 F.2d 192, 195 (2d Cir. 1987)).  In addition, in assessing a motion to dismiss, the court may rely upon "documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint."  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted); see also Keyes v. Annucci, No. 9:18-CV-0372 (GTS/DJS),

2019 WL 4602240, at *7 n.1 (N.D.N.Y. Sept. 23, 2019) (collecting authority and explaining, in detail, that a district court assessing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or 12 (c) may consider any written instrument attached to the complaint as an exhibit and documents incorporated in it by reference).

## B. Plaintiff's First Amendment Retaliation Claims

### 1. Lt. Durkin

Upon careful consideration of the pleadings, including plaintiff's opposition to the motion and attached exhibits, the undersigned finds that defendants are entitled to judgment on the pleadings with respect to plaintiff's First Amendment retaliation claim against Lt. Durkin.

In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must allege that: "(1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). Because of the potential for abuse and the "ease with which claims of retaliation may be fabricated," courts must examine prisoner retaliation claims with "skepticism and particular care." Johnson v. Eggersdorf, 8 F. App'x 140, 144 (2d Cir. 2001) (summary order) (quoting Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)).

It is well settled that the filing of a lawsuit is constitutionally-protected activity. See Espinal, 558 F.3d at 128; Williams v. Ingraham, No. 04-CV-257 (GLS/DRH), 2005 WL 3746222, at *2 (N.D.N.Y. Feb. 3, 2005) ("The [inmate's] conduct at issue—

complaints to judicial officials, filing a lawsuit, and grievances—are clearly constitutionally protected rights.") (citing <u>Morales v. Mackalm</u>, 278 F.3d 126, 131 (2d Cir. 2002)).  On the other hand, a prison inmate's oral speech is subject to certain limitations and may not necessarily constitute protected activity.  <u>See Rodriguez v. Phillips</u>, 66 F.3d 470, 479 (2d Cir. 1995).  Although the Second Circuit has yet to articulate a bright line rule regarding constitutionally-protected oral speech by an inmate, several courts have made clear that a verbal confrontation with a correction officer based on an inmate's dissatisfaction with that officer's directive is one example of speech that is not constitutionally-protected activity.  <u>See Williams v. Smith</u>, No. 11-CV-0601 (LEK/TWD), 2015 WL 1179339, at *10 (N.D.N.Y. Mar. 13, 2015) (verbal complaint "about problems with [inmate's] braces" was not protected conduct); <u>Carl v. Griffin</u>, No. 08-CV-4981 (RMB/MHD), 2011 WL 723553, at *5 (S.D.N.Y. Mar. 2, 2011) ("[The p]laintiff's brief and isolated verbal [encounter with the defendant] does not constitute protected First Amendment speech [because] [t]o construe it as such would elevate every verbal exchange between a prison employee and a prisoner to the level of protected speech under the First Amendment.") (internal quotation marks and citation omitted)); <u>see also</u> <u>Garrido v. Coughlin</u>, 716 F. Supp. 98, 101 (S.D.N.Y. 1989) (finding that the plaintiff's "verbal confrontation" with correction officer was not protected speech or conduct under the First Amendment).

However, courts in this Circuit have concluded that an inmate's oral complaints to a correction officer, under some circumstances, may constitute speech or conduct protected under the First Amendment.  <u>See Smith v. Woods</u>, No. 03-CV-480 (DNH), 2006 WL 1133247, at *10 (N.D.N.Y. Apr. 24, 2006) (Hurd, J.) ("I acknowledge that the

First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers."), aff'd, 219 F. App'x 110 (2d Cir. 2007) (summary order); Gill v. Riddick, No. 03-CV-1456 (RFT), 2005 WL 755745, at *10 (N.D.N.Y. Mar. 31, 2005) (finding the "filing of the grievance agenda and making oral complaints" to be "clearly protected"); Sprau v. Coughlin, 997 F. Supp. 390, 393 (W.D.N.Y. 1998) (finding a prisoner's threat to file a complaint against a prison guard sufficient to establish protected activity); see also Lugo v. Van Orden, No. 07-CV-879 (TJM/GJD), 2008 WL 2884925, at *3 n.4 (N.D.N.Y. July 23, 2008) ("A simple discussion with a corrections officer would not be protected speech unless that discussion was in the form of a complaint or concern about the officer or some policy involved.").

As an initial matter, defendants do not dispute that plaintiff has sufficiently pleaded adverse action in satisfaction of the second prong of the First Amendment retaliation analysis based on the alleged June 8, 2015 assault.  See Dkt. No. 44-1 at 7-9; see also Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) ("[The plaintiff's] claim regarding the retaliatory assault sufficiently describes adverse conduct that would deter a reasonable inmate from exercising his constitutional rights."); Flemming v. King, No. 14-CV-316 (DNH/CFH), 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016) (retaliatory assault constitutes adverse action).  However, whether plaintiff engaged in protected activity by protesting Lt. Durkin's orders to throw away his property is a close call.  On one hand, the exchange between plaintiff and Lt. Durkin could be construed, as defendants argue, as an isolated, verbal dispute concerning the propriety of the amount of personal property in plaintiff's cell and a disagreement as to

22

Lt. Durkin's directive to throw it away.  See Dkt. No. 44-1 at 9.  Viewed in that light, this brief exchange could be considered the type of verbal confrontation between an inmate and a correction officer based on dissatisfaction with that officer's directive that does not constitute constitutionally protected activity.  See Williams, 2015 WL 1179339, at *10; see also Rodriguez, 66 F.3d at 479; Carl, 2011 WL 723553, at *5.  Indeed, plaintiff acknowledges that his "speech (verbally)" in protest to Lt. Durkin's instruction to throw away his personal property "may not in itself be totally protected."  Dkt. No. 48 at 12. On the other hand, plaintiff's verbal protest could be construed as an oral complaint against Lt. Durkin's order to remove property that plaintiff was permitted to have in his cell and, therefore, could arguably be considered protected activity.  See Smith, 2006 WL 1133247, at *10; Gill, 2005 WL 755745, at *10.

However, despite defendants' attempt to frame the issue otherwise, plaintiff's shifting arguments make it unclear whether he is, in fact, attempting to establish that he engaged in protected activity based on the filing of his prior lawsuit.  See Dkt. No. 48 at 12-13.  Considering plaintiff's assertions as contained in his Amended Complaint and Opposition, as the Court may, given his pro se status, see Walker, 717 F.3d at 122 n.1, it is feasible to interpret plaintiff's argument as attempting to establish that he was engaged in protected activity based on his litigation of his then-pending civil rights lawsuit.  See Dkt. No. 48 at 12-13.  Plaintiff twice attempts to establish that his possession of legal papers relating to his prior lawsuit demonstrates that he was "actively litigating" that suit, and he specifically draws attention to the fact that the unidentified members of the search team who searched his cell purportedly spent a majority of their time reading the complaint relating to that lawsuit.  Id. at 12.  He also

23

specifically states that his protest to Lt. Durkin's order to throw away his legal papers could have been a motivating factor for Lt. Durkin's alleged retaliation.  See id. at 13. Viewed in this light, plaintiff clearly establishes that he was engaged in protected activity based on his litigation of his prior lawsuit.  See Espinal, 558 F.3d at 128; Williams, 2005 WL 3746222, at *2.  In any event, even if plaintiff engaged in constitutionally-protected activity based on either his verbal protest or the filing of his prior lawsuit, as discussed below, his First Amendment claim against Lt. Durkin fails to satisfy the third prong of the test.

To plausibly allege causation, a plaintiff "must allege facts suggesting that the protected conduct was a substantial or motivating factor in the prison official's decision to take action against him."  Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotations, brackets, and citation omitted).  It is well settled that "[a]llegations of adverse actions alone . . . are insufficient to establish retaliation absent facts supporting an inference of a causal connection between the adverse actions and the protected conduct."  Baskerville, 224 F. Supp. 2d at 732.  Factors indicating retaliatory motive include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) an inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.  See id. (citing Colon, 58 F.3d at 872-73).  With regard to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action."  Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001).

24

However, as the Second Circuit explained:

> [P]risoner retaliation claims are easily fabricated, and . . .
> pose a substantial risk of unwarranted judicial intrusion into
> matters of general prison administration.  Accordingly, while
> we have held that temporal proximity between protected
> conduct and an adverse action constitutes circumstantial
> evidence of retaliation, we have consistently required some
> further evidence of retaliatory animus before permitting a
> prisoner to proceed to trial on a retaliation claim.

Faulk v. Fisher, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (internal citations and quotation marks omitted).

Here, plaintiff's pleadings are bereft of facts suggesting that Lt. Durkin acquiesced in members of the search team assaulting plaintiff, or otherwise retaliated against him, because of his verbal protest.  Plaintiff's allegations in this regard suggest only that John Doe #1, apparently without provocation, attacked plaintiff for "running his mouth all day."  Amen. Compl. at 13 ¶ 38.  Concerning Lt. Durkin, however, plaintiff asserts only that he "yell[ed]" at him and commanded him to throw away property.  Id. at 13 ¶ 36.  Indeed, plaintiff has not alleged any statements or actions by Lt. Durkin evidencing retaliatory motive based on his verbal protest.  See generally Baskerville, 224 F. Supp. 2d at 732.  Thus, although the allegedly retaliatory assault occurred in close temporal proximity to plaintiff's verbal protest, his conclusory statement that "the fact that [he] protested against throwing away his legal work could have been the motivating factor as to why Lt. Durkin did not intervene [and] stop[] the assault"—without more—fails to state a First Amendment retaliation claim against Lt. Durkin.  Dkt. No. 48 at 13; see Faulk, 545 F. App'x at 58; see also Flemming v. City of New York, No. 18-CV-4866 (GBD), 2019 WL 4392522, at *14 (S.D.N.Y. Aug. 27, 2019) (dismissing a pro se pre-trial detainee's First Amendment retaliation claim where, although the alleged

adverse action occurred in close temporal proximity to the protected activity, the plaintiff failed to allege any facts to support a finding of retaliatory animus).

Alternatively, assuming plaintiff seeks to establish that he engaged in protected conduct based on his litigation of his prior lawsuit, his claim still fails.  Plaintiff does not allege that Lt. Durkin personally read the legal materials in his cell or knew what they were beyond plaintiff's broad statement that "most of [his property] was [his] legal materials."  Amen. Compl. at 13 ¶ 36.  Further, plaintiff does not allege any facts from which the Court can infer that the unidentified officers who allegedly read plaintiff's legal materials informed Lt. Durkin of their contents, and plaintiff does not allege that Lt. Durkin made any statements indicating that he was aware of the contents of the legal papers or of plaintiff's then-pending lawsuit.  See Baskerville, 224 F. Supp. 2d at 32.  In addition, plaintiff does not allege facts from which the Court can infer that his prior lawsuit was in any way related to Lt. Durkin or formed the basis of any of Lt. Durkin's conduct; in fact, plaintiff makes clear that his prior lawsuit was asserted against "another Clinton [C.O.]."  Dkt. No. 48 at 12; see Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing a retaliation claim against a correction officer where, the only alleged basis for retaliation was a complaint written against another officer); Cf. Espinal, 558 F.3d at 130 (concluding that the plaintiff presented sufficient evidence to allow the court to draw a "legitimate inference" that a correction officer retaliated against him based on his filing of a lawsuit against other correction officers).  Thus, given the absence of any facts plausibly suggesting that Lt. Durkin was aware of plaintiff's prior lawsuit or retaliated against him because of it, plaintiff fails to state a First Amendment retaliation claim against Lt. Durkin on that basis.  Accordingly, it is recommended that defendants'

motion to dismiss plaintiff's First Amendment retaliation claim against Lt. Durkin be granted.

## 2. Sgt. Wood

### a. Abandonment of Claim Against Sgt. Wood

As defendants contend, plaintiff did not oppose the portion of the motion to dismiss concerning Sgt. Wood; therefore, the claim should be dismissed as abandoned. See Heyliger v. West, No. 9:18-CV-0336 (TJM/TWD), 2019 WL 4757334, at *4 (N.D.N.Y. Sept. 30, 2019) (dismissing the pro se plaintiff's state law negligence claim as abandoned where the plaintiff failed to respond to that aspect of the defendants' motion to dismiss); McArdle v. Ponte, No. 17-CV-2806, 2018 WL 5045337, at *6 (S.D.N.Y. Oct. 17, 2018) ("[The plaintiff]'s intentional infliction of emotional distress claim against the individual [d]efendants is deemed abandoned because he failed to respond to [the d]efendants' arguments in opposing this motion."); Forney v. Forney, 96 F. Supp. 3d 7, 11 (E.D.N.Y. 2015) (deeming abandoned claims the plaintiff failed to oppose in opposition to the defendants' motion to dismiss); De Sole v. Knoedler Gallery, LLC, 137 F. Supp. 3d 387, 410 (S.D.N.Y. Sept. 30, 2015) (dismissing claim as abandoned when the plaintiff failed to respond to the arguments on a motion to dismiss); see also Thurmand v. Univ. of Connecticut, No. 18-CV-1140 (JCH), 2019 WL 369279, at *3 (D. Conn. Jan. 30, 2019) ("Courts in this Circuit have presumed that plaintiffs have abandoned their claims when they do not oppose a motion to dismiss them." (collecting cases)).  Even if plaintiff had opposed the portion of defendants' motion concerning his

27

claim against Sgt. Wood, it would still fail because plaintiff failed to exhaust his available administrative remedies.

### b. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration.  See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  The exhaustion requirement applies "'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" Cucchiara v. Dumont, No. 9:18-CV-0182 (GLS/CFH), 2019 WL 2516605, at *4 (N.D.N.Y. Apr. 26, 2019) (quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)).  Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages.  See Porter, 534 U.S. at 524.  "To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated." Cuadrado v. Brueault, No. 9:14-CV-1293 (DNH/CFH), 2015 WL 1606178, at *3 (N.D.N.Y. Apr. 8, 2015); see Jones v. Bock, 549 U.S. 199, 218 (2007).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply."  Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (internal quotation marks and citation omitted).  Until

recently, courts in this District followed a three-part test established by the Second

Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004).  Under Hemphill, a

plaintiff's failure to exhaust could be excused if a plaintiff established that his or her

failure to exhaust was justified by "special circumstances."  Id.  However, in Ross v.

Blake, the Supreme Court held that "[c]ourts may not engraft an unwritten 'special

circumstances' exception onto the PLRA's exhaustion requirement."  Ross v. Blake, __

U.S. __, 136 S. Ct. 1850, 1862 (2016).  Thus, the special circumstances exception

previously promulgated by the Second Circuit in Hemphill is no longer consistent with

the statutory requirements of the PLRA.  See Williams v. Correction Officer Priatno, 829

F.3d 118, 123 (2d Cir. 2016).

Even though the Supreme Court's decision in Ross eliminates Hemphill's

"special circumstances" exception, courts must still consider the PLRA's "textual

exception to mandatory exhaustion."  Ross, 136 S. Ct. at 1858.  Under this exception,

courts must determine whether administrative remedies were "available" to a prisoner.

Id.  The Supreme Court identified three circumstances where administrative remedies

may be unavailable to a prisoner.  First, "an administrative procedure is unavailable

when (despite what regulations or guidance materials may promise) it operates as a

simple dead end—with officers unable or consistently unwilling to provide any relief to

aggrieved inmates."  Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738

(2001)).  "Next, an administrative scheme might be so opaque that it becomes,

practically speaking, incapable of use."  Id.  Lastly, administrative remedies are

unavailable where "prison administrators thwart inmates from taking advantage of a

grievance process through machination, misrepresentation, or intimidation."  Id. at 1860.

29

Exhaustion of administrative remedies is an affirmative defense which defendants must raise.  See Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir. 1999). Once raised, the defendants bear the burden of proving that administrative remedies have not been exhausted.  See Howard v. Goord, 98-CV-7471 (FB), 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999) (citations omitted).  The party opposing the affirmative defense "may delay the ultimate determination as to its validity until trial by showing that there is a genuine issue of material fact to be determined."  Id.  "Typically, this inquiry is fact specific and would not be appropriate for resolution on a motion to dismiss." Shoults v. Kooi, No. 9:14-CV-1184 (GLS/DJS), 2016 WL 770060, at *2-3 (N.D.N.Y. Jan. 28, 2016), report and recommendation adopted, No. 9:14-CV-1184, 2016 WL 796083 (N.D.N.Y. Feb. 23, 2016).  "However, if it is apparent from the pleadings themselves, and the documents attached thereto or incorporated therein, that the plaintiff has failed to exhaust his administrative remedies, then the complaint may be dismissed pursuant to Rule 12(b)(6)."  Paschal-Barros v. Kenny, No. 3:18-CV-1870 (VLB), 2019 WL 2720739, at *3 (D. Conn. June 28, 2019).

As defendants note, DOCCS has a well-established three-step administrative procedure for inmate grievances known as the IGP.  See Dkt. No. 44-1 at 10; see also N.Y. COMP. CODES R. & REGS. (7 N.Y.C.R.R.) § 701.5.  First, the inmate must file a complaint with an IGP clerk within 21 calendar days of the alleged incident.  See 7 N.Y.C.R.R. § 701.5(a)(1).  An IGP representative has 16 calendar days to informally resolve the issue.  See id. at § 701.5(b)(1).  If no informal resolution occurs, the Inmate Grievance Review Committee ("IGRC") must hold a hearing within 16 calendar days of receipt of the grievance and must issue a written decision within two working days after

the conclusion of the hearing.  See id. at § 701.5(b)(2)(i)-(ii).  If the determination is

unfavorable to the inmate, the inmate may appeal the IGRC's determination to the

facility superintendent within seven calendar days of receipt of the determination.  See

id. at § 701.5(c)(1).  If the superintendent's determination is unfavorable to the inmate,

the inmate may appeal to CORC within seven calendar days after receipt of the

superintendent's determination.  See id. at § 701.5(d)(i).  CORC must "review each

appeal, render a decision on the grievance, and transmit its decision to the facility, with

reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct

parties within thirty (30) calendar days from the time the appeal was received."  Id. at §

701.5(d)(3)(ii).  "Ordinarily, absent the finding of a basis to excuse non-compliance with

this prescribed process, only upon exhaustion of these three levels of review may a

prisoner seek relief pursuant to section 1983 in a federal court."  Murray v. Goord, 668

F. Supp. 2d 344, 355–56 (N.D.N.Y. 2009).

Here, it is apparent from the face of the Amended Complaint, when considered

together with plaintiff's exhibits, that plaintiff did not exhaust administrative remedies

with respect to Sgt. Wood.  See Paschal-Barros, 2019 WL 2720739, at *3.  Plaintiff

does not allege that he ever filed or attempted to file a grievance against Sgt. Wood

based on the alleged June 25, 2015 incident.  See, e.g., Cruz v. Lee, No. 14-CV-4870

(NSR/JCM), 2016 WL 1060330, at *4 (S.D.N.Y. Mar. 15, 2016) ("[I]t is clear from the

face of the [c]omplaint that [the p]laintiff has not exhausted claims 2-4 . . . . [The p]laintiff

has not alleged that he filed a grievance or even that he attempted to file a grievance

with regards to any of these claims.  Therefore, these claims must be dismissed for [the

p]laintiff's failure to exhaust his administrative remedies.").  Although plaintiff broadly

31

asserts that he exhausted administrative remedies prior to commencing this action by filing his June 25, 2015 grievance "in an attempt to resolve the issues presented" in the Amended Complaint, that grievance does not name Sgt. Wood or mention the alleged June 25, 2015 incident concerning plaintiff's Inmate Injury Report and is limited to the allegations regarding the alleged June 8, 2015 assault.  See Amen. Compl. at 25 ¶ 77; see also Dkt. No. 31-1 at 44-48.  Further, plaintiff's statement concerning exhaustion in his Amended Complaint is taken verbatim from the original complaint—which did not contain any allegations concerning Sgt. Wood.  See id.; see also Dkt. Not. 1 at 18-19 ¶ 82.  Moreover, plaintiff's extensive list of exhibits does not include an inmate grievance filed against Sgt. Wood, and plaintiff does not allege that administrative remedies were not "available" to him with respect to his complaints against Sgt. Wood.  Ross, 136 S. Ct. at 1858.  Indeed, as discussed in Part II.2.a, supra, plaintiff has not addressed defendants' arguments concerning Sgt. Wood at all.  Thus, it is clear from the pleadings that plaintiff failed to exhaust his administrative remedies.  In any event, even assuming plaintiff exhausted administrative remedies, his First Amendment retaliation claim against Sgt. Wood would still fail on the merits for the reasons discussed below.

### c. Failure to State a Claim Against Sgt. Wood

As defendants aptly note, even if plaintiff's reporting of the alleged assault to Sgt. Woods was constitutionally-protected conduct or speech, his retaliation claim fails because he cannot establish adverse action and any misconduct by Sgt. Wood in this regard was de minimis.  See Dkt. No. 44-1 at 10.

To adequately plead an "adverse action," a plaintiff must allege that he was subject to "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" Gill, 389 F.3d at 381 (quoting Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003)).  In considering what constitutes adverse action, a court should be mindful that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." Davis, 320 F.3d at 353 (internal quotation marks, brackets, ellipses, and citation omitted).  If the action would not deter an individual of ordinary firmness, the retaliatory act "is simply de minimis and therefore outside the ambit of constitutional protection." Id. (internal quotation marks and citation omitted).

It is well settled that "complaints that prison officials tampered with, failed to investigate, or improperly processed grievances, without more, do not give rise to liability under § 1983." Celestin v. Premo, No. 9:12-CV-301 (GLS/RFT), 2014 WL 272443, at *3 (N.D.N.Y. Jan. 24, 2014); see Irvis v. Seally, No. 9:09-CV-543 (GLS/ATB), 2011 WL 454792, at *2 (N.D.N.Y. Feb. 4, 2011) ("Thus, regardless of whether and to what extent [the] defendants followed their grievance procedures in investigating or failing to investigate [the plaintiff's] complaints, his claims must fail as a matter of law as they are not actionable under § 1983.").  In Burroughs v. Mitchell, this Court recently dismissed an inmate's retaliation claim based on allegations that an OSI investigator refused to document or investigate his claim that he was assaulted by correction officers.  See Burroughs v. Mitchell, 325 F. Supp. 3d 249, 281 (N.D.N.Y. 2018).

Here, plaintiff, in effect, claims that Sgt. Wood retaliated against him in violation of his First Amendment rights by tampering with his original Inmate Injury Report.  See Amen. Compl. at 18 ¶ 48.  This claim appears sufficiently analogous to claims of prison officials refusing to document or investigate inmate complaints or tampering with inmate grievances—which do not constitute adverse actions to support a claim of retaliation pursuant to Section 1983.  See Burroughs, 325 F. Supp. 3d at 281; Celestin, 2014 WL 272443, at *3.  Moreover, as defendants contend, any injury resulting from Sgt. Wood's alleged actions was de minimis as it did not deter plaintiff from exercising his constitutional rights.  See Dkt. No. 44-1 at 10.  Indeed, it is beyond dispute that plaintiff filed his grievance against the other defendants on the same day that he met with Sgt. Wood, and later commenced the present civil rights lawsuit; therefore, plaintiff is hard-pressed to demonstrate how Sgt. Wood's alleged removal of his allegations against the other defendants on an Inmate Injury Report deterred him from exercising his constitutional rights in violation of the First Amendment when he advanced those same allegations—in greater detail—in his grievance.  See Dkt. No. 31-1 at 44-48.  Based on the foregoing, it is recommended that plaintiff's First Amendment retaliation claim asserted against Sgt. Wood be dismissed.

## C. Plaintiff's State Law Negligence Claims

As an initial matter, plaintiff failed to address defendants' argument that his state law negligence claim should be dismissed pursuant to New York Correction Law § 24, and instead argued only in support of previously-dismissed IIED claim.  See Dkt. No. 48 at 10-11.  Thus, the Court could presume plaintiff's state law negligence claim

34

abandoned and dismiss it on that basis.  See, e.g., Heyliger, 2019 WL 4757334, at *4.

Alternatively, even assuming plaintiff had adequately addressed this issue, as

defendants correctly aver, plaintiff's pendent state law negligence claims are barred by

New York Correction Law § 24.

New York Correction Law § 24(1) provides:

> No civil action shall be brought in any court of the state,
> except by the attorney general on behalf of the state, against
> any officer or employee of the department, which for
> purposes of this section shall include members of the state
> board of parole, in his or her personal capacity, for damages
> arising out of any act done or the failure to perform any act
> within the scope of the employment and in the discharge of
> the duties by such officer or employee.

Courts look at the following factors to determine whether a defendants' action is within

the scope of employment:

> the connection between the time, place and occasion for the
> act; the history of the relationship between employer and
> employee as spelled out in the actual practice; whether the
> act is one commonly done by any employee; the extent of
> departure from normal methods of performance; and
> whether the specific act was one that the employer could
> have reasonably anticipated.

Ierardi v. Sisco, 119 F.3d 183, 187 (2d Cir. 1997) (quoting Riviello v. Waldron, 47 N.Y.

297, 303 (N.Y. 1979)).

"Claims for damages arising out of a DOCCS employee's act performed within

the scope of his employment may be maintained in the New York Court of Claims as a

claim against the State of New York."  Lawrence v. New York, 9:18-CV-0316

(BKS/DEP), 2018 WL 3104450, at *7 (N.D.N.Y. June 22, 2018) (internal quotation

marks and citation omitted).  The test to determine whether the defendants' actions fall

within the scope of their employment is "whether the act was done while the servant

was doing his master's work no matter how irregularly, or with what disregard of instructions." Cruz v. New York, 24 F. Supp. 3d 299, 310 (W.D.N.Y. 2014); see also Gore v. Kuhlman, 217 A.D.2d 890, 891 (N.Y. App. Div. 3d Dept. 1995) ("That defendants abused their authority as [the] plaintiff's supervisors for the purpose of harassment . . . constitutes no more of a departure from the normal methods of performing the duties of employment than a correction officer's use of excessive force to quell an inmate disturbance, resulting in an assault . . . we [therefore] conclude that [the] plaintiff's action is barred by Correction Law § 24(1)).

Here, the complaint alleges that defendants, who, at all relevant times were DOCCS employees, committed the state law tort of negligence through their acts and omissions during the search of plaintiff's cell. See Amen. Compl. at 23-24 ¶¶ 67-69; 25 ¶¶ 74-76. "Frisking inmates and searching their cells for contraband are essential aspects of the maintenance of prison safety and as such are among the primary duties and responsibilities of correction[] officers." Degrafinreid v. Ricks, 452 F. Supp. 2d 328, 333-34 (S.D.N.Y. 2006) (internal quotation marks and citation omitted).   Therefore, even assuming the acts complained of were "violative of [p]laintiff's constitutional rights," they "were clearly done within the scope of defendant[s'] employment." Cruz, 24 F. Supp. 3d at 310 (quoting Heyliger v. Gebler, 496 F. Supp. 2d 250, 253 (W.D.N.Y. 2007)); see also Dallio v. Hebert, 678 F. Supp. 2d 35, 57 (N.D.N.Y. 2009) (dismissing the plaintiff's state law assault, battery, and negligence claims arising out of an alleged series of beatings following a cell extraction and search, as barred by New York Correction Law section 24).   Thus, because plaintiff's state law negligence cause of action asserts claims against DOCCS officers and employees in their personal

36

capacities for damages "arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer[s] or employee[s,]" they are barred by New York Correction Law § 24(1).  N.Y. CORRECT. LAW § 24(1); see Cruz, 24 F. Supp. 3d at 310; Dallio, 678 F. Supp. 3d at 47. Accordingly, it is recommended that plaintiff's state law negligence claims be dismissed as against all moving defendants.


### D. Personal Involvement of Supt. Racette

Liberally construing the pleadings, the undersigned finds that plaintiff has sufficiently alleged facts to establish Supt. Racette's personal involvement for purposes of his supervisory liability claim premised on his Eighth Amendment claims.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Further, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control."  Kinch v. Artuz, No. 97-CV-2419 (LAP), 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing Colon, 58 F.3d at 874 and Wright, 21 F.3d at 501).  Thus, supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Colon, 58 F.3d at 874 (holding that the fact that the defendant occupied a high-ranking position in the New

York prison hierarchy, without more, was insufficient to establish personal involvement).

Rather, "a plaintiff must plead that each Government-official defendant, through the

official's own individual actions, has violated the Constitution."  Iqbal, 556 U.S. at 676.

Supervisory personnel may be considered personally involved in their

subordinate's conduct if:

> (1) the defendant participated directly in the alleged
> constitutional violation;
>
> (2) the defendant, after being informed of the violation
> through report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the
> rights of inmates by failing to act on information indicating
> that unconstitutional acts were occurring.

Colon, 58 F.3d at 873 (citing Wright, 21 F.3d at 501 (additional citation

omitted)).[18]  Accordingly, "supervisory liability may be imposed when an official has

actual or constructive notice of unconstitutional practices and demonstrates 'gross

negligence' or 'deliberate indifference' by failing to act."  Meriwether v. Coughlin, 879

F.2d 1037, 1048 (2d Cir. 1989) (quoting McCann v. Coughlin, 698 F.2d 112, 125 (2d

Cir. 1983)).

---

[18]  Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five
Colon factors which were traditionally used to determine personal involvement.  Pearce v. Estate of
Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011) (recognizing that several District Courts in the Second
Circuit have debated Iqbal's impact on the five Colon factors), rev'd in part on other grounds sub nom.,
Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order); Kleehammer v. Monroe Cnty., 743 F.
Supp. 2d 175, 185 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories
pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing
that Iqbal eliminated Colon's personal involvement standard).

In Alexander v. Cuomo, a recent Northern District case arising out of the same post-escape investigation at Clinton, the Court concluded that the plaintiff sufficiently pleaded Supt. Racette's personal involvement in various alleged Eighth Amendment violations.  See Alexander v. Cuomo, 9:17-CV-309 (BKS/CFH), 2018 WL 2041576, at *6 (N.D.N.Y. Feb. 26, 2018).  There, the plaintiff's allegations concerning Supt. Racette's personal involvement included that he was the "policymaker and supervisor of Clinton at the time of the escape," "dozens of other inmates housed [in the escapee's cell block] reported similar experiences" of assault by staff following the escape, long-standing and "endemic" abuse and brutality against inmates had occurred at Clinton, and two CA reports which revealed high instances of reports of staff brutality against inmates before and after the June 2015 escape.  Id. at *3, *6.  The Court held that, "[g]iven the unusual circumstances following this escape and the widespread allegations of beatings and similar conduct, the [c]omplaint plausibly alleges that [Supt.] Racette had reason to know of the violations and was grossly negligent or deliberately indifferent in failing to prevent them."  Id. at *6 (citing Meriwether, 879 F.2d at 1048).

Similarly, in Carpenter v. Apple, a case involving a correction officer's alleged sexual assault against an inmate in the custody of Albany County Correctional Facility (ACCF), the Court concluded that the plaintiff sufficiently alleged personal involvement of the County Sheriff under the third and fifth Colon factors "for the reasons stated in her opposition memorandum of law."  Carpenter v. Apple, 9:15-CV-1269 (GTS/CFH), 2017 WL 3887908, at *10 (N.D.N.Y. Sept. 5, 2017).  There, the plaintiff argued that the County Sheriff was responsible for the creation of policies at ACCF and had knowledge of a "repeated pattern of sexual abuse of female inmates" by male correctional officers

but failed to implement policies to prevent sexual abuse in the facility.  See id. at *5.

With respect to the third Colon factor, the Court concluded that the plaintiff's allegations

that the County Sheriff was on notice of previous incidents of sexual assault involving

male correction officers in the facility, but failed to institute policies to safeguard against

the same type of harms she claimed "plausibly [alleged] that [the County Sheriff]

allowed the continuation of a policy under which unconstitutional practices occurred."

Id. at *10.  As to the fifth Colon factor, the Court held that, "for the reasons stated" with

respect to the third Colon factor, the plaintiff "alleged facts plausibly suggesting that [the

County Sheriff] exhibited deliberate indifference to the rights of inmates by failing to act

on information indicating that male correction officers at ACCF were having

inappropriate sexual contact with female detainees."  Id. at *12.

Here, liberally construing the pleadings, the undersigned finds that plaintiff has

sufficiently alleged Supt. Racette's personal involvement under the third, fourth, and fifth

Colon factors.  With respect to the fourth Colon factor, plaintiff plausibly alleges that

Supt. Racette was grossly negligent in the supervision of his subordinates, as the

Amended Complaint, Opposition, and documentary evidence sufficiently establishes for

purposes of the instant motion that he "was aware of . . . subordinate[s'] prior

substantial misconduct but failed to take appropriate action to prevent future similar

misconduct before . . . plaintiff was eventually injured."  Rasparado v. Carlone, 770 F.3d

97, 117 (2d Cir. 2014).  Similar to the plaintiff in Alexander, plaintiff asserts that Supt.

Racette was aware of long-standing complaints of a pattern of abuse against inmates at

Clinton by DOCCS personnel both before the escape and during the ensuing

investigation immediately thereafter.  See Alexander, 2018 WL 2041576, at *6; see also

40

Amen. Compl. at 10 ¶ 23; Dkt. No. 48 at 10.  Plaintiff provides detailed factual

allegations of correctional staff's assaultive behavior against other inmates during

interrogations carried out during the post-escape investigation similar to that which he

allegedly experienced on June 8, 2015.  See Amen. Compl. at 11 ¶ 29.  The plausibility

of his claims is bolstered by the CA letters attached to the Amended Complaint, which

express that organization's serious concerns about the treatment of inmates at Clinton

after the escape following interviews it conducted with thirty people at the facility and

note that its fall 2014 report "documented serious issues of staff abuse" at Clinton based

on its 2012 investigation.  Dkt. No. 31-1 at 17; Dkt. No. 31-1 at 18; see Alexander, 2018

WL 2041576, at *6.

As to the fifth Colon factor, the undersigned finds that, similar to Alexander and

Carpenter, plaintiff alleges facts plausibly suggesting that Supt. Racette, in his role as

superintendent of Clinton during the relevant time period, exhibited deliberate

indifference by disregarding information indicating that correctional officers at that

facility were physically assaulting inmates before and after the June 2015 escape.  See

Alexander, 2018 WL 2041576, at *6; Carpenter, 2017 WL 3887908, at *10, *12.

Considering the CA letters attached to the Amended Complaint, along with plaintiff's

allegations that he had been attacked by correctional staff previously which formed the

basis of his prior civil rights lawsuit, and plaintiff's arguments in opposition to

defendants' motion that inmates at Clinton had persistently complained about staff

abuse for years, plaintiff sufficiently alleges that Supt. Racette was on notice of

complaints of systemic staff abuse against inmates at Clinton but failed to take

corrective action.[19]  See Dkt. No. 31-1 at 17; Dkt. No. 48 at 10.  Thus, as in Alexander, "[g]iven the unusual circumstances following this escape and the widespread allegations of beatings and similar conduct, the [Amended] Complaint plausibly alleges that [Supt.] Racette had reason to know of the violations and was grossly negligent or deliberately indifferent in failing to prevent them."  Id. at *6.

With respect to the third Colon factor, the undersigned finds that, similar to the plaintiff's claims in Carpenter, plaintiff plausibly alleges that Supt. Racette was on notice of DOCCS personnel's custom of systemic unconstitutional practices against inmates before and after the June 2015 escape, but failed to take corrective action to prevent the same kind of harm plaintiff allegedly suffered.  See Carpenter, 2017 WL 3887908, at *5, *10.  Indeed, the CA letters strengthen the plausibility of plaintiff's allegations in this regard and suggest that Supt. Racette had constructive notice that similar unconstitutional practices were being carried out prior to the escape and failed to take preventative measures to cull such practices during the post-escape investigation.  See Carpenter, 2017 WL 3887908, at *10; see also Plunkett v. City of New York, No. 10-CV-6778 (CM), 2011 WL 4000985, at *9 (S.D.N.Y. Sept. 2, 2011) (holding that the plaintiff adequately pleaded personal involvement of the defendant prison warden based on the third Colon factor where he alleged that the warden had received information concerning a pattern of correction officer-sanctioned inmate-on-inmate violence but failed to take steps to prevent staff from continuing such constitutional violations).

---

[19]  Although plaintiff also refers to the ILC minutes in support of this claim, it is unclear when the inmate complaints of physical and verbal abuse discussed at the August 21, 2015 ILC meeting were filed.  See Dkt. No. 31-1 at 21.  As it is unclear whether these complaints were filed before the alleged June 8, 2015 incident, the Court lacks sufficient information to determine whether those complaints support plaintiff's claim that Supt. Racette was on notice of systemic abuse against inmates on that basis.

However, the undersigned finds that, insofar as plaintiff alleges that he suffered injuries as a result of Supt. Racette's endorsement of Governor Cuomo's purported policy to "to do whatever was necessary to obtain information about the escape," his claim in this regard is wholly conclusory as he has failed to plausibly allege any factual allegations in support thereof.  Amen. Compl. at 11 ¶ 27; see, e.g., Bivona v. McLean, 9:19-CV-0303 (MAD/TWD), 2019 WL 2250553, at *4 (N.D.N.Y. May 24, 2019) (holding that the plaintiff's "entirely conclusory" allegations that the defendant "creat[ed] or ratifi[ed] a policy under which . . . alleged constitutional violations occurred" failed to establish personal involvement).  Thus, the Court does not find that plaintiff has sufficiently alleged Supt. Racette's personal involvement based on Racette's alleged endorsement of Cuomo's purported policy to "to do whatever was necessary to obtain information about the escape."  Amen. Compl. at 11 ¶ 27.

As a final matter, defendants correctly point out that plaintiff, unlike other inmates who have filed section 1983 lawsuits alleging constitutional violations as a result of the investigation following the June 2015 escape at Clinton, was not housed in the Honor Block.  Cf. Martinaj, 2019 WL 652251, at *1-2 (honor block inmate); Alexander, 2018 WL 2041576, at *2 (same); Zenon v. Downey, No. 9:18-CV-0458 (LEK/ATB), 2018 WL 6702851, at *8 (N.D.N.Y. Dec. 20, 2018) (same).  However, this fact, alone, does not appear to render plaintiff's supervisory liability claim against Supt. Racette implausible. Plaintiff has not based his allegations and factual assertions in support of his claim for supervisory liability against Supt. Racette on the highly-publicized treatment of Honor Block inmates following the escape.  Compare Zenon, 2018 WL 6702851, at *8 (incorporating by reference into the plaintiff's complaint a New York Times article and

CA report specifically discussing conditions of Honor Block inmates following the escape) with Amen. Compl. at 10 ¶ 23, 11 ¶ 32 (alleging facility-wide abuse of inmates following the escape); Dkt. No. 48 at 10 (alleging "years" of complaints concerning "beatings and assaults" by correctional staff at Clinton); Dkt. No. 31-1 at 17 (noting the CA's concern over treatment of inmates at Clinton, generally, following the escape and observing that its 2014 report based on a 2012 investigation documented abuse of inmates at Clinton without limiting its scope to inmates housed on the Honor Block). Moreover, plaintiff's Eighth Amendment claim is based on alleged constitutional violations that occurred during a facility-wide cell frisk conducted in response to the escape, which was not limited to Clinton's Honor Block.  See Amen. Compl. at 12 ¶ 30. Therefore, at this early stage in the litigation, the undersigned recommends that defendants' motion to dismiss plaintiff's supervisory claims against Supt. Racette be denied.

### III. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that the partial Motion to Dismiss of defendants Supt. Racette, Lt. Durkin, Sgt. King, Sgt. Hutti, Sgt. Wood, C.O. Wyatt, C.O. Tyler, C.O. Dubrey, C.O. Spinner, and C.O. Reyell pursuant to Fed. R. Civ. P. 12(c) and 12(b)(6) (Dkt. No. 44) be **GRANTED IN PART** and the following of plaintiff's claims be **DISMISSED WITH PREJUDICE**:

(1) First Amendment retaliation claims against Lt. Durkin and Sgt. Wood;

(2) New York State law negligence claims against all moving defendants; and

(3) Supervisory liability claim against Supt. Racette insofar as plaintiff alleges that Supt. Racette endorsed Cuomo's policy to use "whatever means necessary to obtain information about the escape" (Dkt. No. 49 at 2), and it is further

**RECOMMENDED**, that defendants' partial Motion to Dismiss be **DENIED IN PART** insofar as it seeks dismissal pursuant to Fed. R. Civ. P. 12(c) (Dkt. No. 44) and the following of plaintiff's claims proceed:

(1) Supervisory liability claim against Supt. Racette to the extent that claim is **NOT** based on Supt. Racette's alleged indorsement of Cuomo's policy to use "whatever means necessary to obtain information about the escape" (Dkt. No. 49 at 2); and it is further

**ORDERED**, that the Clerk of the Court revise the docket to reflect the correct spelling of Lt. Durkin's and Sgt. Wood's names, and it is further

**RECOMMENDED**, that the action be **TERMINATED** as to Sgt. Wood, and it is further,

**ORDERED**, that that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health

and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P.

6(a), 6(e), 72.[20]


      Dated: December 13, 2019
      Albany, New York


                                     _____
                                     Christian F. Hummel
                                     U.S. Magistrate Judge

---

[20] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).